UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OLIMPIA VILLALOBOS,<br><br>       *Plaintiff*,<br><br>v.<br><br>TELEMUNDO NETWORK GROUP LLC;<br>NBCUNIVERSAL MEDIA, LLC;<br>COMCAST HOLDINGS CORPORATION;<br>FRANCISCO SUÁREZ; and<br>RAFAEL ORTEGA,<br><br>       *Defendants*. | Civ. No. 1:22-cv-07665-JPC<br><br>SECOND AMENDED COMPLAINT |

Plaintiff Olimpia Villalobos ("Plaintiff"), by and through her attorneys, Eisenberg & Baum, LLP, hereby states her Complaint against Defendants Telemundo Network Group LLC; NBCUniversal Media, LLC; Comcast Holdings Corporation (the "Corporate Defendants"); Francisco "Cisco" Suarez; and Rafael "Coco" Ortega (the "Individual Defendants") (collectively, "Defendants") and alleges as follows based upon personal knowledge and information and belief:

**PRELIMINARY STATEMENT**

1. Olimpia Vilallobos, a respected athlete and television personality, was hospitalized while filming the sports-themed Spanish-language reality show "Exatlón Estados Unidos," and Defendants allowed a producer of the show to take Plaintiff's phone, have sole access to her in her hospital room, and prevent her from communicating with anyone else or leave the hospital. Soon thereafter, that same producer lured Ms. Vilallobos to a purported business meeting and raped her. Despite being a popular contestant, Plaintiff was not invited back to further seasons of the show after these traumatic events.

2. These events were devastating to Ms. Villalobos and resulted in severe

psychological and emotional distress that continue to this day. Not only did Defendants knowingly and wrongfully confine her to a hospital room with no means of communication and later sexually assaulted one of her confiners with Defendants' knowledge; Defendants also terminated Ms. Villalobos from the show for being a victim of these acts. Defendants have taken her livelihood, self-confidence, and dignity as a result.

## PARTIES

3. Plaintiff Olimpia Villalobos is an individual residing in Mexico City, Mexico. Ms. Ms. Vilallobos is an athlete who appeared on Season 3 of Defendants' show "Exatlón Estados Unidos."

4. Upon information and belief, Defendant Telemundo Network Group LLC is a Delaware limited liability company that produces the show "Exatlón Estados Unidos" under the ownership, control, and supervision of Defendants NBCUniversal Media, LLC and Comcast Holdings Corporation, and with a registered address for service at c/o Enterprise Corporate Services LLC, 1201 N. Market Street, Suite 1000, Wilmington, DE 19801 and a principal place of business at 1221 Avenue of the Americas, New York, NY, 10020.

5. Upon information and belief, Defendant NBCUniversal Media, LLC is a Delaware limited liability company with a registered address for service at c/o Enterprise Corporate Services LLC, 1201 N. Market Street, Suite 1000, Wilmington, DE 19801 and a principal place of business at 30 Rockefeller Plaza New York, NY 10112. Upon information and belief, Defendant NBCUniversal Media, LLC is a parent company of Defendant Telemundo Network Group, LLC and finances and exerts supervisory control over the shows it produces, including "Exatlón Estados Unidos."

6. Upon information and belief, Defendant Comcast Holdings Corporation is a

Pennsylvansia for-profit corporation that is a multinational telecommunications conglomerate and the parent company of Defendant NBCUniversal Media, LLC.

7. Upon information and belief, Defendant Francisco "Cisco" Juárez is an individual who is employed by the corporate Defendants as a producer of the show "Exatlón Estados Unidos" during the season that Plaintiff was a contestant.

8. Upon information and belief, Defendant Rafael "Coco" Ortega is an individual who is employed by the corporate Defendants as a producer of the show "Exatlón Estados Unidos" during the season that Plaintiff was a contestant.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendants pursuant to CPLR 301 and 302, as Defendants Telemundo Network Group, LLC, NBCUniversal Media, LLC, and Comcast Holdings Corporation conduct business and use real property in New York, and because Defendants Telemundo Network Group, LLC and NBCUniversal Media, LLC have a principal place of business in New York. Upon information and belief, Defendants Rafael Ortega and Francisco Suarez are employed or otherwise instruments and/or agents of one or more of the Corporate Defendants in the production of "Exatlón Estados Unidos" and consented to personal jurisdiction directly or indirectly through a forum selection clause contained in a "Participant Agreement" that Plaintiff was required to execute before appearing on "Exatlón Estados Unidos."

10. Specfically, upon information and belief, Acun Medya Korlátolt Felelősségű Társaság ("Acun"), directly or through any subsidiaries or affiliates, was the main production company for "Exatlón Estados Unidos" during the season Ms. Villalobos was a contestant.

11. Upon information and belief, the Corporate Defendants (including through the Individual Defendants) were responsible for producing, financing, managing, supervising,

directing, organizing, casting, or otherwise making substantive decisions for "Exatlón Estados Unidos" during this relevant time period.

12. Ms. Villalobos, as a prerequisite to appearing on "Exatlón Estados Unidos," executed a "Participant Agreement" with Acun (and possibly one or more of the Defendants herein), which states that "[t]his Agreement will be governed and construed under the laws of the State of New York without regard to conflicts of law provisions. The parties submit to the in personam jurisdiction of the Supreme Court of the State of New York in New York County and the United States District Court for the Southern District of New York for purposes of . . . any court proceeding under this Agreement.  The parties waive any objections that they may have as to jurisdiciton or venue in the above courts."

13. Upon information and belief, the Individual Defendants were at all relevant times employed or otherwise instruments and/or agents of the Corporate Defendants, and individually and/or through any such Corporate Defendants, were producers of "Exatlón Estados Unidos" during the relevant time period in conjunction, coordination, and contractual privity with Acun. As such, the Individual Defendants acted as agents of the Corporate Defendants and Acun at all relevant times and for purposes of the production of "Exatlón Estados Unidos."

14. Upon information and belief, the Individual Defendants were also subject to supervision, management, and/or control by Acun and any or all of the Corporate Defendants as relevant to the production of "Exatlón Estados Unidos" during the relevant time period.

15. Because the Individual Defendants, as producers of "Exatlón Estados Unidos" during the relevant time period, had interests that were derivative of, directly, related to, and/or predicated on Acun's interests as they relate to the show, the Individual Defendants were thus closely related to Acun for purposes of the Participant Agreement such that they could or should

4

have forseen the enforceability of the forum selection clause against them, even in the event that they are not direct signatories to the Participant Agreement.

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claims arising under the laws of the United States, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiff's claims arising under state, local, and/or common law.

17. Venue is proper in this District because Defendants properly removed this action to this District pursuant to 28 U.S.C. §§ 1331, 1332, 1441, and 1446.

18. To the extent applicable, this action falls within one or more of the exceptions set forth in CPLR 1602, specifically: (5) (due to Defendants' intentional conduct), (7) (as Defendants acted with reckless disregard), (8) Article Ten of the Labor Law, (11) (as Defendants acted knowingly or intentionally, and in concert). This action also falls within one or more of the exceptions set forth in CPLR 1601, as with due diligence, Plaintiff is unable to obtain jurisdiction over any such person that may have any fault in this matter aside from Defendants herein, and in that Defendants were vicariously responsible for any possible additional parties with liability herein. The amount of damages sought herein exceeds the jurisdictional limits of all other courts which would otherwise have jurisdiction.

## STATEMENT OF FACTS

19. "Exatlón Estados Unidos" is a popular Spanish-language reality sports competition television show where two teams of contestants compete against each other in various physical and athletic challenges, particularly on custom-built "parkour" courses.[1] "Exatlón Estados Unidos" is the American version of the show "Exatlón."

---

[1] *See* https://www.exatlon.tv/estadosunidos.

20. In each season of the show, celebrities and professional athletes make up one team, while the other team consists of ordinary people from all walks of life.[2]

21. Plaintiff Olimpia Villalobos is a professional athlete who appeared on season three of "Exatlón Estados Unidos" in 2019.

22. In or around August through September 2019, when Ms. Villalobos was injured during the production of the show and became gravely ill, she was treated horribly by Defendants' staff and producers, who forbade her from calling her home and speaking to any friends or family about what was happening to her while she was in the intensive care unit. They also refused to allow her to leave.

23. While confined to the hospital, Ms. Villalobos was not permitted to have any visitors except for Defendant Ortega, a producer of the show, who would frequently visit her for no apparent reason. Defendants confiscated Ms. Villalobos' personal phone and there was no other phone in her hospital room. Defendant Ortega's constant visits and Defendants' isolation of Ms. Villalobos from any other visitors or communications made her feel extremely uncomfortable and unsafe.

24. Ortega used his power as producer of the show to gain constant and unrestricted access to Ms. Villalobos and control all of her communication with the outside world. As she would later come to realize, Ortega did this out of a sexual interest in Ms. Villalobos and a desire to isolate and manipulate her.

25. In addition to confiscating her phone while she was still in the intensive care unit, Ortega finally allowed Ms. Villalobos just one phone call to her mother on Ortega's phone and only for a few minutes, while he stood over her and told her to lie to her mother that everything

---

[2] *See* https://www.exatlon.tv/estadosunidos.

was fine. Ortega only allowed this because the fact she was injured on the show was going to be aired and Defendants could not continue to falsely imprison her without access to communication any longer.

26. On December 28, 2019, a few months after Ms. Villalobos was released from the hospital, Ortega invited her to a business meeting at the Hyatt Regency in Andares, Guadalajara, Mexico to discuss the possibility of her returning for another season of the show. Two other contestants from the show also attended this corporate meeting at the hotel's restaurant and bar.

27. Despite knowing of Defendant Ortega's propensity for sexual misconduct and his unusual interest in Ms. Villalobos as demonstrated during her hospital visit, Defendants authorized and condoned this purported business meeting.

28. Because Ms. Villalobos was unfamiliar with the nature of showbusiness and had never had a meeting with superiors in a hotel, she did not know what to expect and felt compelled to meet with Ortega, believing this meeting was for business purposes only and was necessary to secure a casting on subsequent seasons of the show. Ms. Villalobos also believed that Ortega was essentially the "voice" of the show given that he was the only person that Defendants allowed her to communicate with in the hospital.

29. Ms. Villalobos intended to return home after the meeting or stay with one of the other contestants. But after the other contestants left, Ms. Villalobos was left with Ortega and a male friend of his.

30. When Ms. Villalobos said she was going to get her own hotel room for the night, Ortega insisted she stay at his hotel room instead. To convince her to stay, Ortega assured Ms. Villalobos that he would sleep in the other bed or on the floor and would not touch her.

31. Ms. Villalobos acquiesced because Ortega had decision-making power in the

production of a show that she had potential to continue to be involved in. Ms. Villalobos, like other contestants, understood that alienating him would result in her being disadvantaged or blacklisted from the show and damage to her career. From Ms. Villalobos' perspective, her relationship with Ortega had been purely professional until this point.

32.     When they got to Ortega's room, Ms. Villalobos fell asleep. She later woke up to Ortega on top of her while touching her breasts and saying that "he liked her very much" and that "he would not do anything to hurt her or disrespect her" as he was continuing to press himself on her and put the full weight of his body on hers.

33.     Ms. Villalobos asserted herself and said "No! You said you wouldn't try anything!" but he forced himself on her against her will. Ms. Villalobos was suddenly awakened, in a state of shock, immobilized by Ortega's body weight and was unable to fight him off. Accordingly, Ortega proceeded to rape her.

34.     After this horrific event, Ms. Villalobos felt coerced to maintain appearances of friendship with Ortega as she feared that complaining to anyone in the Defendants' companies would provoke Ortega to disadvantage and eradicate her casting and opportunities with Telemundo and the other Corporate Defendants.

35.     Upon information and belief, Ortega raped Ms. Villalobos knowingly, and using his power over her professional opportunities. Ortega used his power over Ms. Villalobos to lure her to a corporate hotel room by representing that the meeting was for a legitimate business purpose, but which was actually a pretext for forced sexual assault.

36.     Given (1) Ortega's position of power and influence and (2) a known pervasive pattern and practice of sexist conduct among Defendants that included turning a blind eye to these types of accusations and Defendant Ortega's sexual misconduct, Ms. Villalobos knew that any

complaint would likely backfire and she might not be able to continue appearing on the show. This potential loss of livelihood caused Ms. Villalobos a severe loss of self-esteem and feelings of helplessness and dread. Indeed, despite what Ms. Villalobos thought was a productive business meeting (before she was raped), she was not invited back for subsequent seasons of the show.

37. In addition to a general culture of sexual misconduct and indifference to the same among Defendants and their producers, Defendants knew that Ortega frequently exhibited predatory sexual behavior to show contestants and other women. Ms. Villalobos also knew that Ortega could be very controlling. Ortega manipulated Ms. Villalobos and ordered her to erase all text messages between them to discard any evidence that he had lured her to his hotel that night, and raped her. For example, Ortega told Ms. Villalobos that "no one can find out about this . . . erase the texts right now." He intentionally manipulated Ms. Villalobos into compliance by promising that he would guarantee that she would be on the next season of the show. Left without a choice, she acquiesced.

38. To make matters worse, Ms. Villalobos had to repeatedly interact with Ortega after the incident because Defendants made him responsible for conducting "confessional" interviews of contestants like Ms. Villalobos that are typical of realty competition shows like "Exatlón Estados Unidos" to provide narration, exposition, and commentary, despite knowing of his propensity for predatory sexual misconduct. This constant interaction with her abuser significantly exacerbated Ms. Villalobos' emotional injuries and trauma.

39. Upon information and belief, there was a widespread pattern of sexism, sexual abuse, and sexual harassment by Ortega and the Corporate Defendants' other producers and executive staff of the show.

40. The only other supervisor on staff was the show's senior producer, Defendant

Francisco "Cisco" Suárez, who was unapproachable and had a reputation of supporting the misogynistic culture that allowed sexual harassment and abuse in the workplace. Hence, Ms. Villalobos felt fear and discomfort about asking him for any help.

41. Despite much fanfare during her season, Ms. Villalobos was not invited back for additional seasons of the show because Defendants wanted to cover up Ortega's sexual assault and their treatment of her while she was in the hospital.

42. As a result of Defendants' actions and inactions, Ms. Villalobos suffered severe psychological and emotional distress and humiliation. Ms. Villalobos was raped by a person with control over her livelihood; a producer of the show she was currently filming. Ms. Villalobos knew that Defendants were aware of Ortega's conduct and would nevertheless protect Defendant Ortega, and that Ms. Villalobos could not complain without losing her source of income and potentially damaging her career and reputation. This distress was naturally exacerbated by Defendant Ortega's continued attempts to contact Ms. Villalobos after he sexually assaulted her. Ms. Villalobos still has nightmares of her stay at the hospital and Defendants' treatment of her there, not to mention Defendants' condonement of the horrific sexual abuse and rape she later suffered at Defendant Ortega's hands.

**FIRST CAUSE OF ACTION**
(Violation of 18 U.S.C. § 1591 against Defendant Ortega)

43. Plaintiff repeats, reiterates and re-alleges each and every allegation set in detail above as if set forth more fully and at length herein.

44. The Trafficking Victims Protection Act ("TVPA") creates a civil remedy by victims against perpetrators and others who benefitted financially from participation in a sex trafficking venture. *See* 18 U.S.C. § 1595. A TVPA claim must plead that the defendant "knowingly . . . benefits, financially or by receiving anything of value, from participation in a [sex trafficking

venture,] while knowing . . . that means of force, threats of force, fraud [or] coercion . . . will be used to cause [a] person to engage in a commercial sex act." 18 U.S.C. § 1591(a)(2). In addition to traditional sex trafficking ventures such as forced prostitution, the TVPA equally applies in simpler and less sensational situations to "defendants who have lured women, under false pretenses and with lucrative promises, for sexual purposes." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 516 n.5 (S.D.N.Y. 2018).[3]

45. Ortega frequently traveled to different states for Defendants and for "Exatlón Estados Unidos" and had Plaintiff travel to multiple locations for work relating to the show, including having her sign her contract for the show in Miami, Florida. Unbeknownst to Plaintiff, Ortega actually intended to sexually assault Plaintiff during one such occasion, using the pretext of the show and of a business meeting regarding Plaintiff's continued appearance on the show to force Plaintiff to perform a commercial sex act.

46. Ortega knew that he would use promises of continued participation on the show and continued work with Defendants in order to create a pretext for him to meet with Plaintiff for business-related purposes and used fraud, physical force or coercion to force a sexual encounter without Plaintiff's consent.

47. Ortega, through his position with Defendants, arranged business meetings with Plaintiff to lure her into a purported work-related environment that turned into a sexual assault.

48. Ortega knew that a continued role on the show and his potential influence on Plaintiff's career in the entertainment industry was something of significant and commercial value to Plaintiff, which he used to perform the sexual assault described above.

---

[3] Indeed, "Congress noted that 'trafficking in persons is not limited to the sex industry,' and that 'traffickers lure women and girls into their networks through false promises of decent working conditions at relatively good pay as nannies, maids, dancers, factory workers, restaurant workers, sales clerks, or models.'" *Id*. at 514 (citing Pub. L. No. 106-386 § 102, 114 Stat. 1488 (2000)).

49. Ortega used his power over Plaintiff as described above to lure Plaintiff to his hotel room by representing that the meeting was for a legitimate business purpose, but which was actually a pretext for the forced sexual assault described above. Plaintiff felt compelled to meet with him because of Ortega's power over her.

50. Ortega traveled in interstate and foreign commerce, knowingly recruiting or enticing Plaintiff, offering her something of value such as continued appearances on the show he and Defendants produced, knowing that he would use this offer as a means to coerce her to have a private "business" meeting with Plaintiff and then use fraud, intimidation, force and/or coercion into a forced sexual encounter without her consent.

51. Thus, Ortega knowingly affected interstate commerce by recruiting, enticing, transporting, and soliciting Plaintiff, knowing that he intended to and did perform a commercial sex act on her without Plaintiff's consent.

52. As a result, Plaintiff experienced injury in the form of severe emotional pain and suffering, emotional distress and humiliation.

53. For the reasons alleged above, Plaintiff seeks compensatory and punitive damages at an amount to be determined by trial, and an award of attorneys' fees, costs, and disbursements.

**SECOND CAUSE OF ACTION**
(Violation of 18 U.S.C. § 1591 against Corporate Defendants and Defendant Suarez)

54. Plaintiff repeats, reiterates and re-alleges each and every allegation set in detail above as if set forth more fully and at length herein.

55. The Corporate Defendants and Defendant Suarez knowingly participated in Ortega's venture in violation of 18 U.S.C. § 1591 by knowingly benefiting from, facilitating, and receiving value for, the venture in which Ortega traveled in foreign and interstate commerce, with knowing, or in reckless disregard of the facts, that Ortega would defraud, force and/or coerce

sexual encounters from women seeking to do business with the Corporate Defendants.

56. Ortega and employees of the Corporate Defendants, acting in the scope and course of their employment as Ortega had directed, coordinated to form a venture that coerced, transported, and harbored Plaintiff, either with knowledge or in reckless disregard for the fact that Ortega would use threats, means of force, and coercion to force Plaintiff into a commercial sex act.

57. The Corporate Defendants knew or were in reckless disregard of the fact that it was an established pattern and practice of Defendant Ortega to travel in interstate and foreign commerce to lure females such as Plaintiff into fraudulent, forced, or coerced pretextual business meetings that, unbeknownst to Plaintiff, would lead to forced sexual acts.

58. Employees of the Corporate Defendants, including Defendant Suarez, knew from observations of Ortega that he was sexually aggressive.

59. Despite this knowledge, the Corporate Defendants continued to pay for and facilitate Ortega's interstate and foreign trips while knowing or recklessly disregarding the fact that he would encounter aspiring women seeking to do business with the Corporate Defendants and seek to coerce, defraud, and/or force sexual activity in the guise of legitimate production work.

60. As a result, Plaintiff experienced injury in the form of severe emotional pain and suffering, emotional distress and humiliation.

61. For the reasons alleged above, Plaintiff seeks compensatory and punitive damages at an amount to be determined by trial, and an award of attorneys' fees, costs, and disbursements.

**THIRD CAUSE OF ACTION**
(Negligent Hiring, Supervision, or Retention against the Corporate Defendants)

62. Under a claim for negligent supervision or retention under New York law, an employer may be liable "for the tort of an employee against a third party when the employer has either hired or retained the employee with knowledge of the employee's propensity for the sort of

behavior which caused the injured party's harm." *Detone v. Bullit Courier Service, Inc.*, 140 A.D.2d 278, 279 (1st Dep't 1988).

63. At all times relevant, a servant-master relationship existed between the Corporate Defendants and Defendant Ortega such that Defendants controlled the means and manner of the performance of Defendant Ortega's job duties, including his conduct toward contestants of shows that he produces.

64. During the course of Defendant Ortega's employment, Defendants knew or should have known of his propensity, pattern, and practice of sexual harassment, misconduct, and/or violence, but did not take any action against him.

65. Based upon what they knew or should have known about Defendant Ortega, the Corporate Defendants had a duty to investigate his conduct, which would have revealed his unsuitability for employment, and to discharge him.

66. Given actual and/or constructive knowledge of Defendant Ortega's propensity for sexual misconduct, the Corporate Defendants acted unreasonably in retaining him as an employee at all relevant times.

67. Defendants also knew or should have known of Defendant Ortega's specific sexual interest in Plaintiff prior to his sexual assault. Defendants would not allow her to leave and communicate with anyone else while at the hospital, but allowed Defendant Ortega to use his power as producer of the show to gain constant and unrestricted access to Plaintiff.

68. Based upon what they knew or should have known about Defendant Ortega, the Corporate Defendants had a duty to control his conduct during all times that he was acting, or otherwise empowered to act, as a producer with power to set up business meetings with any contestant he desired.

69. At all times relevant, a servant-master relationship existed between the Corporate Defendants and Defendant Ortega that required the Corporate Defendants to act with reasonable care in the supervision of Defendant Ortega's performance of his job duties, including properly supervising Defendant Ortega's interactions with contestants of the show.

70. At all times relevant, a servant-master relationship existed between the Corporate Defendants and Defendant Ortega that required the Corporate Defendants to act with reasonable care in its retention of Defendant Ortega based upon what they knew or should have known about his unfitness for employment, including a duty to take further actions such as investigation or discharge.

71. At all times relevant, the Corporate Defendants' own negligence as Defendant Ortega's employer created the risk of harm to Plaintiff and, as a result, the Corporate Defendants had a common-law duty to make a reasonable effort to avoid further harm to others, including Plaintiff.

72. At all times relevant, Defendant Ortega's sexual assaults were committed outside of the scope and course of employment because he was not employed to sexually assault contestants and individuals appearing on the shows he produces.

73. At all times relevant, the Corporate Defendants had a duty to protect third parties, including but not limited to Plaintiff, who were within the foreseeable orbit of risk of harm created by Defendant Ortega because that risk was not readily discoverable by Plaintiff before she was sexually assaulted.

74. At all times relevant, the Corporate Defendants knew, or in the exercise of reasonable care, should have known that Defendant Ortega was unfit, dangerous, and a threat to the health, safety, and welfare of those he was allowed to exert power over in his position,

including Plaintiff.

75. As a result of the failure to act with reasonable care toward Plaintiff, the Corporate Defendants breached one or more of the duties owed to Plaintiff and failed to protect her from the sexual assault committed by Ojeda while he was an agent and employee of the Corporate Defendants and authorized by them to conduct pretextual business meetings at locations in the possession and financial and supervisory control of the Corporate Defendants.

76. The Corporate Defendants knew that Defendant Ortega was conducting a business meeting that resulted in him raping Plaintiff and paid for and facilitated his use of the hotel to

commit the act after meeting with Plaintiff and multiple other contestants of the show for a purported business meeting.

77. As a direct and proximate result of the Corporate Defendants' failure to act with reasonable care in the discharge of one or more of their duties to Plaintiff, Plaintiff suffered bodily harm and severe and permanent psychological and emotional injuries, shame, and humiliation. These injuries are permanent and ongoing in nature. The Corporate Defendants' actions and inactions exacerbated and aggravated Plaintiff's mental anguish, showing a callous disregard for her safety and well-being.

78. For the reasons alleged above, Plaintiff seeks compensatory and punitive damages in an amount to be determined at trial, and an award of attorneys' fees, costs, and disbursements.

## FOURTH CAUSE OF ACTION
(Negligent Infliction of Emotional Distress against all Defendants)

79. Plaintiff repeats, reiterates and re-alleges each and every allegation set in detail above as if set forth more fully and at length herein.

80. Under a claim for negligent infliction of emotional distress, "[w]hen there is a duty owed by defendant to plaintiff, breach of that duty resulting directly in emotional harm is

16

compensable even though no physical injury occurred" *Kennedy v McKesson Co.*, 58 NY2d 500, 504 (1983).

81. Defendants' conduct, including (1) Defendant Ortega's sexual assault of Plaintiff, (2) the Corporate Defendants' and Defendant Suarez's negligent hiring, retention and supervision of Defendant Ortega, (3) the Corporate Defendants' and Defendant Suarez's pattern and practice of supporting and perpetuating a misogynistic culture of sexual harassment and abuse in the workplace; and (4) Defendants' tortious confinement of Plaintiff described above, negligently caused emotional distress to Plaintiff.

82. At all times relevant, a servant-master relationship existed between the Corporate Defendants and Defendant Ortega such that the Corporate Defendants controlled the means and manner of the performance of Defendant Ortega's job duties, including his conduct toward contestants of shows that he produces.

83. During the course of Defendant Ortega's employment, Defendants knew or should have known of his propensity, pattern, and practice of sexual harassment, misconduct, and/or violence. Based upon what they knew or should have known about Defendant Ortega, Defendants had a duty to Plaintiff and other show contestants to investigate and control his conduct during all times that he was acting, or otherwise empowered to act, as a producer with power to set up business meetings with any contestant he desired.

84. As set forth above, at all times relevant, Defendants' own negligence as Defendant Ortega's employers and/or supervisors created a risk of harm to Plaintiff and, as a result, Defendants had a common-law duty to make a reasonable effort to avoid further harm to others, including Plaintiff.

85. Defendants also owed a duty of care to Plaintiff as a contestant on a show

Defendants were producing, which was breached when Defendants refused to allow Plaintiff to leave the hospital or communicate with others while injured, and when Defendants permitted Defendant Ortega to sexually assault Plaintiff.

86. Defendants could reasonably foresee that these actions would result in the infliction of emotional distress upon Plaintiff. Indeed, Plaintiff suffered severe emotional distress as a result of the breaches of duty described above.

87. For the reasons alleged above, Plaintiff seeks compensatory and punitive damages in an amount to be determined at trial, and an award of attorneys' fees, costs, and disbursements.

### FIFTH CAUSE OF ACTION
(New York Adult Survivors Act – against all Defendants)

88. Plaintiff repeats, reiterates and re-alleges each and every allegation set in detail above as if set forth more fully and at length herein.

89. Pursuant to the New York Adult Survivors Act (S.66A/A.648A)[4], Plaintiff may bring previously time-barred sexual-abuse claims. *See* CPLR 214-j.

90. As alleged above, by raping and sexually assaulting Plaintiff, Defendant Ortega committed sexual abuse against Plaintiff that caused severe psychological injury and is actionable under the New York Adult Survivors Act.

91. As alleged above, the Corporate Defendants and Defendant Suarez negligently caused this sexual abuse to occur through their actions and inactions.

92. Due to the intentional and negligent acts by Defendants complained of herein, Plaintiff suffered severe emotional distress.

93. Defendants' egregious conduct described throughout this Complaint was malicious, willful, and wanton, and gives rise to an inference that Defendants acted with a degree

---

[4] *See* https://www.nysenate.gov/legislation/bills/2021/S66.

of high moral turpitude.

94. For the reasons alleged above, Plaintiff seeks compensatory and punitive damages in an amount to be determined at trial, and an award of attorneys' fees, costs, and disbursements.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief against Defendants:

A. Issue an injunction to enjoin Defendants from implementing or enforcing any policy, procedure, or practice that denies employees the full and equal enjoyment of the benefits of employment Defendants' companies, and specifically enjoin them:

  i. to develop, implement, promulgate, and comply with a policy providing for the training of each and every employee and manager in the civil right of employees in the workplace, including but not limited to sexual harassment, gender discrimination, and retaliation;

  ii. To develop, implement, promulgate, and comply with a policy providing for reporting and investigation of complaints regarding civil rights abuses, including but not limited to sexual harassment and assault; and

  iii. To develop, implement, promulgate, and comply with a policy providing for disciplinary measures to be imposed upon any person found responsible for civil rights abuses, including but not limited to sexual harassment and assault;

B. Enter judgment against Defendants and an award of damages, including but not limited to compensatory damages for emotional distress, nominal, punitive, and/or exemplary damages, attorneys' fees, pre- and post-judgment interest in an amount to be determined at trial by a jury; and

    C.    Any further relief as this Court deems just and proper.

Dated: October 26, 2023

                        Respectfully submitted,

                        **EISENBERG & BAUM, LLP**

By:   /s/ *Andrew M. Clark*
       Andrew M. Clark
       24 Union Square East, Penthouse
       New York, NY 10003
       (212) 353-8700
       aclark@eandblaw.com
       *Attorneys for Plaintiff*